UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
LUIS PEREZ, Individually and On Behalf
Of All Others Similarly Situated,

                Plaintiff,                      MEMORANDUM
                                                          AND ORDER

   -against-                                        13 CV 2109 (RML)

METRO DAIRY CORP., RAZ DAIRY INC.,
and EDWARD ZASTENIK, Jointly and
Severally, and any other entities with or
controlled by METRO DAIRY CORP.,
RAZ DAIRY INC., and/or EDWARD
ZASTENIK,

                Defendants.
------------------------------------------------------------X
LEVY, United States Magistrate Judge:

       This case is before me on consent of the parties. (Consent to Jurisdiction by U.S. Magistrate Judge, filed Mar. 17, 2014.) Plaintiffs move for sanctions related to alleged witness tampering. (See Plaintiffs' Memorandum of Law, dated Aug. 25, 2015 ("Pls.' Mem.").) At issue is a May 20, 2015 encounter between opt-in plaintiff Efrain Zemora and defendant Edward Zastenik. (Id. at 2.) Defendants Metro Dairy Corp., Raz Dairy Inc., and Edward Zastenik (collectively "defendants") oppose the motion. (See Defendants' Proposed Findings of Fact & Conclusions of Law, dated Sept. 25, 2015 ("Defs.' Opp'n").) For the reasons stated below, plaintiffs' motion is denied.

## BACKGROUND AND FACTS

       Plaintiff Luis Perez commenced this collective action on April 5, 2013, seeking unpaid wages and overtime, plus liquidated damages, interest, attorney's fees, and costs under the Fair Labor Standards Act, 29 U.S.C. §§ 201, et seq., and the New York Labor Law.

(Complaint, dated Apr. 5, 2013 ("Compl."), ¶¶ 1-2.) According to the complaint, at all times relevant to this action, "[d]efendants have been in the Dairy Distribution industry, owning and operating a Dairy located at 215 Lake Avenue, Yonkers, NY."[1] (Id. ¶ 16.) Plaintiffs claim that defendants "had a policy and practice of refusing to pay minimum wage for all hours worked as well as overtime compensation to [] employees for their hours worked in excess of forty (40) hours per work week." (Id. ¶ 35.)

On October 21, 2013, the parties agreed, by so-ordered stipulation, to conditional collective certification. (Order, dated Oct. 21, 2013.) Opt-in plaintiff Efrain Zamora ("Zamora") consented to join this action. (Consent to Join Collective Action, filed Dec. 6, 2013, Dkt. No. 27.) Plaintiffs allege that Mr. Zamora "worked for [d]efendants from 2005 to March 2013 as a milk truck driver assistant." (Plaintiffs' Amended Proposed Findings of Fact, dated Oct. 8, 2015, ¶ 1; see Transcript of July 14, 2015 Evidentiary Hearing, filed Aug. 18, 2015 ("Tr."), at 15-19.) Plaintiffs have alleged that Mr. Zamora "typically worked seventy-eight (78) hours per week" for defendants. (Proposed Joint Pretrial Order, filed May 29, 2015 ("JPTO").)

On November 10, 2014, plaintiffs requested leave to move for discovery sanctions, alleging, inter alia, that defendant Edward Zastenik ("Zastenik") committed perjury while testifying at a June 15, 2014 deposition. (Letter of Odalis M. Encarnacion, Esq., dated Nov. 6, 2014.) I denied that request. (Minute Entry, dated Nov. 19, 2014.) On January 9, 2015, defendants moved to decertify the conditionally certified collective action. (Motion to Decertify

---

[1] Plaintiffs allege that defendant Edward Zastenik "is an officer, director and/or managing agent of" defendants Metro Dairy Corp. and Raz Dairy Inc., who "set the terms and conditions over [p]laintiffs' work schedule and wage payments." (Compl. ¶ 9.) Defendants admit that defendant Edward Zastenik is an officer of defendants Metro Dairy Corp. and Raz Dairy Inc. (Answer, dated June 11, 2013, ¶ 5.)

Collective Action, dated Jan. 9, 2015.) On the same date, plaintiffs moved for spoliation sanctions and other relief based on defendants' failure to produce employment documents and records. (Discovery Motion, dated Jan. 9, 2015.) On April 6, 2015, I denied both motions. (See Memorandum and Order Denying Defendants' Motion to Decertify the Collective Action, dated Apr. 6, 2015; Memorandum and Order Denying Plaintiffs' Discovery Motion, dated Apr. 6, 2015.) Having resolved these issues, I scheduled a trial to commence on July 13, 2015.[2] (Minute Entry, dated Apr. 24, 2015.)

Now before the court is plaintiffs' motion for sanctions related to alleged witness tampering. Plaintiffs' allegations concern a May 20, 2015 encounter between Mr. Zamora and Mr. Zastenik. By letter dated May 28, 2015, plaintiffs notified the court of their witness tampering allegations. (Letter of Odalis M. Encarnacion, Esq., dated May 28, 2015.) This letter included a sworn declaration of Mr. Zamora, describing the incident. (See Declaration of Efrain Zamora, sworn to May 23, 2015 ("Zamora Decl.").) On June 22, 2015, the parties appeared before me to discuss plaintiffs' allegations. (Minute Entry, dated June 22, 2015.) Plaintiffs then requested an evidentiary hearing relating to their anticipated motion for sanctions. (Letter of Odalis M. Encarnacion, Esq., dated June 22, 2015.) I granted that request and held the evidentiary hearing on July 14, 2015. (Scheduling Order, dated June 29, 2015; Minute Entry, dated July 14, 2015.)

Two witnesses testified at the July 14, 2015 evidentiary hearing: Mr. Zamora and Mr. Zastenik, the two principal participants in the May 20, 2015 encounter. (See Tr.) With the

---

[2] Due to the present motion, trial was adjourned. (See Order, dated June 29, 2015.)

3

exception of Mr. Zamora's May 23, 2015 declaration, no other relevant evidence is before the court.  (See Zamora Decl.)

The May 20, 2015 incident occurred at approximately 12:00 p.m. at Mr. Zamora's current place of employment, a block-long garage where food and beverage carts, or "pushcarts," are unloaded, cleaned, and re-stocked.  (See Tr. at 6, 8, 13-14.)  This facility is located at 49-47 31st Street, Long Island City, New York (the "Long Island City Garage").  (Plaintiffs' Amended Findings of Fact, dated Oct. 8, 2015, ¶ 4.)

At the evidentiary hearing, Mr. Zamora testified that he had worked at the Long Island City Garage for approximately one year.  (Id. at 6, 15.)  His job duties include parking, unloading, and cleaning the food and beverage carts.  (Id. at 14.)  Prior to working at the Long Island City Garage, Mr. Zamora testified that he worked at night, part-time, at a similar facility.  (Id. at 15, 20.)  Mr. Zamora held this part-time employment while also working during the day as a milk truck driver's assistant, allegedly for defendants.  (Id. at 20.)

1. Mr. Zamora's Testimony

Mr. Zamora's conversation with Mr. Zastenik on May 20, 2015 was conducted in English.  (Id. at 23.)  Although Mr. Zamora testified that he understands "some English," at the evidentiary hearing he testified through a Spanish interpreter.  (Id. at 3, 23.)  He recalled his encounter with Mr. Zastenik as follows:

> Q. So turning you back to -- your attention to that same date
> during your shift about twelve noon, did anyone aside from you or
> that other co-worker or anyone else that works there enter or exit
> the premises where you perform your duties?
>
> A. Eddie.  Yes, Eddie.
>
> …

4

Q. How do you know Mr. Zastenik?

A. Because when he came in, he came in and starting [*sic*] asking questions to the guy who works over there during that shift and he was asking who is the friend. So he asked who's the friend so they gave him out and pointed at me and he get his cell phone out and started recording me. So I was very afraid of this person. I was scared . . . I started getting very nervous so I started asking him 'What are you doing, why are you asking?' So he said to me 'No, no, no, that's okay, that's okay,' and I said 'Why are you recording me? I have no enemies' . . . [H]e was repeating, 'No, that's okay, that's okay.' I said 'No, that's not okay. It's a crime. You have no right to start recording and taking pictures of me here.'

So he started asking about the owner and asking why I was working there. He started insulting me and saying that I was a piece of shit and that I shouldn't have that job. And that . . . he wanted to speak to the owner so the owner would fire me . . . So I got very scared and he started talking to the other guy. So he started talking personally to the other guy that he wanted to speak to the owner that I shouldn't be in that job, that I was a bad person, that there were a number of things about me. And so he started saying that I was the person who had stole money . . . So I said 'Why are you saying those kinds of things about me?'

So he said to me, 'No the problem is that you took me to court.' I said 'Yes, I did take you to court because I used to work with you and you guys fired me without any reason.' And so he started saying it would be better for me to have papers or he would kick me out. He would send me back to Mexico. So I got really scared. After he went there I couldn't really be at peace in my work. I was always turning looking behind my back to see if somebody was following me or showing up.

(Id. at 8-10.)

2. Mr. Zastenik's Testimony

Mr. Zastenik's recollection of the encounter differed from Mr. Zamora's. Mr. Zastenik also offered an alternative reason for his presence at the Long Island City Garage. (See Tr. at 29-44.) Mr. Zastenik testified that he had visited the Long Island City Garage on about six occasions in the five months prior to May 20, 2015. (Tr. at 30-31.) During this time period, Mr.

5

Zastenik worked as a driver delivering milk for a company called Best Choice. (Id. at 31, 39.) The Long Island City Garage was on his delivery route. (Id. at 31) When making deliveries to the Long Island City Garage, Mr. Zastenik testified that he "particularly spoke to" an employee there that he refers to as Mexico.[3] (Id.)

Mr. Zastenik testified that he had delivered milk to the Long Island City Garage one to two weeks prior to May 20, 2015. (Id. at 32.) At that time, he spoke to Mexico. (Id.) Mr. Zastenik and Mexico discussed Mr. Zamora's history of employment:

> Q. And what was the conversation that you had with Mexico at that time?
>
> A. I asked him if [Mr. Zamora] worked there and I told him the reasons why and Mexico said yes, he does work here.
>
> Q. And what was the reason why you asked whether he worked there?
>
> A. I told Mexico, you know, that [Mr. Zamora] claimed that he had worked for my driver 77 hours when I know he worked for a pushcart that Christian[, a milk delivery truck driver,] used to pick him up at.

(Id. at 32.)

This conversation ended shortly thereafter because Mr. Zastenik and Mexico were busy. (Id. at 33.) They agreed that Mr. Zastenik would return at a later date. (Id.) Mr. Zastenik returned to the Long Island City Garage on May 20, 2015:

> Q. Now, on May 20th when you entered that location in Long Island City, where did you go?
>
> A. . . . I went into the office to talk to Mexico . . . .
>
> Q. And when you went back and you started talking to Mexico, what did you ask him and what happened?

---

[3] Mr. Zastenik testified that he did not see Mr. Zamora at the Long Island City Garage on any of the occasions that he visited prior to May 20, 2015. (Tr. at 31.)

6

A. I asked Mexico, you know, about Christian -- where did Christian pick [Mr. Zamora] up, you know, how many hours did he work?

. . .

Q. And did Mexico answer those questions?

A. Yes. Mexico told me that when [Mr. Zamora] worked -- he didn't work for that -- he worked for the garage on Lawman [] Avenue [*sic*] and he worked at nighttime. He would get there around 7 at night and then my driver, you know, said that he picked him up at 5:30 in the morning. So when I was talking with Mexico, you know, Mexico goes he works here during the day. So he was behind the counter. As we were talking, he came around behind the counter and we went out into like the corridor, you know, where you could drive through . . . And Mexico pointed out [Mr. Zamora] and I took my phone out and I took a picture . . . .

Q. Did you take a video of him at all that day?

A. No.

Q. You took how many pictures?

A. One picture.

Q. Why did you take his picture?

A. Because I never knew who he was and I was going to ask people if they would go to court and testify that he worked at another job.

Q. And then after you took the picture, what happened?

A. Me and Mexico were talking. [Mr. Zamora] started walking towards us and he started entering the conversation . . . He said to me, you know, 'What are you doing here?' You know, and I kept on talking to Mexico. We went back into how many hours he said he worked. You know, and I said to Mexico, 'You told me he worked 12 hours in his other job.' So I said, 'Do the math. This is impossible that he claimed that he worked 77 hours here and that you told me he worked 60 hours at his other job . . . [Mr. Zamora] got -- he like started smiling, you know, and he says to me, 'That's when I worked with Christian. When I worked with Jessie, Jessie, I work with Jessie.' And I turned around to him, I said 'Jessie that piece of shit that stole a lot of money from me? Jessie?' And then I turned to, you know, to Mexico again, left him out of the

7

conversation and I said, 'I just need someone to keep on coming back, you know, come to court with me and just testify that he has worked at a pushcart while he worked for Christian.'

Q. And what happened after that?

A. [Mr. Zamora] came, you know, he came to me and [] said to me, 'You think you're going to get someone here to testify against me?' Something in that line. He says, 'You have no proof.'

. . .

Q. Did you ever mention immigration?

A. No.

(Tr. at 33-36.) Mr. Zastenik further testified that, since his attorney advised him of plaintiffs' allegations, he has not returned to the Long Island City Garage. (Id. at 41-42.)

### 3. Plaintiffs' Motion

On August 25, 2015, plaintiffs moved for sanctions, asserting, inter alia, that "[t]he evidence presented during the July 14, 2015 evidentiary hearing showed and demonstrated that the [d]efendant by his actions, intentionally and unlawfully used intimidation in an attempt to prevent [p]laintiff's testimony."[4] (Pls.' Mem. at 2.) Plaintiffs request, inter alia, that the court, pursuant to its inherent power, impose litigation-ending sanctions or, alternatively, provide an adverse instruction to the jury.[5] (Id. at 3.) Plaintiffs also request that the court refer "these unlawful acts on the part of Defendant . . . to the U.S. Attorney's Office to determine what criminal violations or charges, if any, are warranted." (Id.) In their opposition, defendants argue

---

[4] Mr. Zamora is included as a witness for plaintiffs in the parties' Joint Pretrial Order, which was filed on May 29, 2015. (JPTO.)

[5] Plaintiffs' proposed jury instructions are, "along the lines of, 'This Court finds that the Defendants attempted to tamper with and intimidate one of the Plaintiffs to clearly cause him panic, anxiety, and fear which ultimate goal was to abandon the action against the Defendants and cause other members of the class to do the same.'" (Pls.' Mem. at 28.)

8

that plaintiffs have failed to satisfy their evidentiary burden of establishing witness tampering or other litigation misconduct. (Defs.' Opp'n at 6-7); see 15 U.S.C. 1512(b).

## DISCUSSION

1. Court's Inherent Power

It is beyond dispute that "witness tampering is extremely serious misconduct." Harris v. SCA Rest. Corp., No. 09 CV 2212, 2014 WL 996249, at *4 (E.D.N.Y. Mar. 14, 2014) (citation and internal quotation marks omitted). "A court has the inherent power to sanction a party 'for conduct which abuses the judicial process.'" Riley v. City of New York, No. 10 CV 2513, 2015 WL 541346, at *7 (E.D.N.Y. Feb. 10, 2015) (quoting Chambers v. NASCO, Inc., 501 U.S. 32, 44-45 (1991)). "Although requests for sanctions following witness tampering are not common in federal court, other courts have held that witness tampering is sanctionable under a court's inherent power." SCA Rest. Corp., 2014 WL 996249, at *4; see also Riley, 2015 WL 541346, at *7; In re Brican Am. LLC Equip. Lease Litig., 977 F. Supp. 2d 1287, 1292 (S.D. Fla. 2013); Compton v. Alpha Kappa Alpha Sorority Inc., 938 F. Supp. 2d 103, 105-07 (D.D.C. 2013). "Because of their very potency, inherent powers must be exercised with restraint and discretion." Chambers, 501 U.S. at 44. "'Sanctionable conduct must be proven by clear and convincing evidence and the district court must make a specific finding of bad faith.'" Riley, 2015 WL 541346, at *7 (quoting Amerisource Corp. v. RX USA Int'l Inc., No. 02 CV 2514, 2010 WL 2730748, at *5 (E.D.N.Y. Apr. 17, 2014)); see also SCA Rest. Corp, 2014 WL 996249, at *4. Additionally, "'inherent-power sanctions are appropriate only if there is clear evidence that the conduct at issue is (1) entirely without color and (2) motivated by improper purposes.'" Riley, 2015 WL 541346, at *7 (quoting Wolters Kluwer Fin. Servs. Inc. v. Scivantage, 564 F.3d 110, 114 (2d Cir. 2009)).

9

2. Analysis

As noted, Mr. Zamora and Mr. Zastenik recalled their encounter on May 20, 2015 differently. Mr. Zamora testified that he was threatened and demeaned. (See Tr. at 4-28.) Mr. Zastenik testified that he visited the Long Island City Garage to speak to Mexico about Mr. Zamora's employment history. (Tr. at 33.) Mr. Zastenik testified that he referred to the instant action in relation to his efforts to obtain a witness with knowledge of Mr. Zamora's employment history. (Tr. at 35.) He further testified that he "never threatened [Mr. Zamora] at all." (Tr. at 36.)

Plaintiffs argue that Mr. Zastenik's testimony is not credible. Mr. Zamora testified that, besides himself, there were two other employees at the Long Island City Garage at the time of the incident, Abraham and Enrique. (Id. at 6-7, 21-22.) Mr. Zamora testified that Abraham was "by [his] side" when Mr. Zastenik arrived and that Enrique was "in the office." (Id. at 22.) Plaintiffs insist that Mr. Zastenik could not have visited the Long Island City Garage at 12:00 p.m. with the intention of speaking to the person he knew as Mexico because "Mexico clearly works the night shift."[6] (Pls.' Mem. at 6; see also Pls.' Mem. at 7-10, 15, 16, 26, 33.) They argue that Mexico and Enrique cannot be the same person because "Enrique works the day shift." (Id. at 6.) Consequently, plaintiffs assert that Mr. Zastenik's "visit to [the Long Island City Garage] on that day was motivated by an improper purpose; that purpose was to influence by intimidation." (Id. at 15.)

---

[6] It is unclear how plaintiffs reached this conclusion. The issue of Mexico's shift hours was not addressed at the evidentiary hearing.

I find that plaintiffs have failed to satisfy their evidentiary burden with respect to Mr. Zastenik's intent. Significantly, plaintiffs do not account for a portion of Mr. Zamora's testimony that undermines their argument:

> Q. Now, you indicated that there were two people working at the time on May 20, 2015 that you saw Mr. Zastenik, correct?
>
> A. Yes
>
> Q. One of those people was the manager, correct?
>
> A. Yes
>
> Q. What was the manager's name?
>
> A. Abraham. That's the day manager. The night manager is the guy in charge, the guy in the office.
>
> Q. You indicated that when Mr. Zastenik first came in --
>
> A. He went to see the guy in the office
>
> . . .
>
> Q. So he went to see the man in the office. What was that man's name?
>
> A. His name is Enrique
>
> Q. And do you know whether or not Mr. Zastenik had ever met him before?
>
> A. I don't know. He didn't mention it to me. He said that somebody had gone there asking questions but he didn't tell me their name.

(Tr. at 21-22.) In other words, Mr. Zamora conceded that the night manager was present in the office at noon.

Plaintiffs also argue that the court should not credit Mr. Zastenik's testimony because defendants did not establish how Mexico could have known specific details about Mr. Zamora's employment history. (Pls.' Mem. at 7-8.) I note that plaintiffs did not inquire about this issue during their cross-examination of Mr. Zastenik. (See Tr. at 37-42.) Moreover,

11

plaintiffs' argument misallocates the burden of proving sanctionable conduct. As the moving party, plaintiffs must establish by clear and convincing evidence that Mr. Zastenik engaged in witness tampering. See Riley, 2015 WL 541346, at *7; In re Brican Am. LLC Equip. Lease Litig., 977 F. Supp. 2d at 1293. Finally, plaintiffs argue that the court should not credit Mr. Zastenik's version of events because "this Mexico individual was never mentioned or listed as a potential witness by the [d]efendants on their Joint Pretrial Order." (Pls.' Mem. at 11; see JPTO.) This argument is similarly unconvincing.

In sum, the evidence before me consists of testimony from two interested witnesses whose recollection differed.[7] This record is insufficient to merit the imposition of sanctions. For the same reason, I find that referral of these accusations to the United States Attorney's Office is unwarranted.[8] Mr. Zastenik has testified that, after consulting with his attorney, he has not returned to Mr. Zamora's place of employment. (Tr. at 41-42.) I find this course of action prudent. Additionally, as a cautionary measure, I direct Mr. Zastenik not to initiate contact with Mr. Zamora during the pendency of this action.

---

[7] I note that Mr. Zamora's May 23, 2015 declaration is largely consistent with his testimony at the evidentiary hearing. (See Zamora Decl.; Tr. at 4-29.)

[8] Of course, the court's permission is not required in order for plaintiffs to pursue criminal charges.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion for sanctions related to alleged witness tampering is denied.

SO ORDERED.

Dated: Brooklyn, New York
February 25, 2016

/s/
ROBERT M. LEVY
United States Magistrate Judge